UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------x
                    :

MISS UNIVERSE L.P., LLLP and DONALD J. TRUMP,  :

              Plaintiffs,      :

                    :  Case No. 1:15-cv-5377 (JGK)

          -against-       :

                    :

UNIVISION NETWORKS & STUDIOS, INC. and  :
ALBERTO CIURANA, individually,        :

                    :

              Defendants.    :

                    :
------------------------------------------------------------------------x

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

GIBSON, DUNN & CRUTCHER LLP

Randy M. Mastro
Amer S. Ahmed
200 Park Avenue
New York, New York 10166-0193
Tel.:  (212) 351-4000
Fax:  (212) 351-4035

Miguel A. Estrada
1050 Connecticut Avenue, N.W.
Washington, DC  20036
Tel.:  (202) 955-8500
Fax:  (202) 530-9616

*Attorneys for Defendants Univision Networks & Studios, Inc. and Alberto Ciurana*

## TABLE OF CONTENTS

Page

I.      PRELIMINARY STATEMENT ...................................................................1

II.     FACTUAL BACKGROUND ......................................................................4

        A.      Univision's Predominantly Hispanic and Mexican-American Audience. ..............4

        B.      Univision Bargains to Bring Miss USA and Other Pageants to Univision's
                Audience. ..................................................................................4

        C.      Trump Frustrates the Essential Purpose of the Agreement by Crassly
                Stereotyping and Denigrating Univision's Audience in his Presidential
                Campaign Announcement..................................................................5

        D.      Univision Terminates the Spanish-Language Pageant Deal. ...................7

        E.      Alberto Ciurana Re-Posts an Image of Trump to his Personal Instagram
                Account. ..................................................................................7

        F.      Trump Sues on Behalf of Himself and Miss Universe. ..........................8

III.    LEGAL STANDARD.............................................................................8

IV.     ARGUMENT ....................................................................................9

        A.      Trump's Frivolous Defamation Claim Fails for Multiple Independent
                Reasons. .................................................................................10

                1.      No Reasonable Person Could Interpret the Image as a Provably False
                        Statement of Fact, as Opposed to a Protected Opinion...................10

                2.      Trump Cannot Claim that Univision is Liable for Ciurana's Re-Post............14

                3.      Trump Has Failed to Plead Any Claim for Damages or Defamation *Per Se*. .15

        B.      Plaintiffs Have Failed to State a Claim for Tortious Interference with
                Contract.................................................................................16

                1.      Plaintiffs Fail to Plead that NBC Actually Breached......................17

                2.      Plaintiffs Fail to Plead that Univision Caused NBC to Breach. ...............18

                3.      At Most, Plaintiffs Plead Persuasion, Not "Improper Procurement."..............20

        C.      Trump's Amended Complaint Belies Any Claim to Relief under the
                Agreement...............................................................................22

                1.      Trump Frustrated the Contract's Purpose, Rendering It a Nullity..................22

**TABLE OF CONTENTS**
(continued)

Page

      2.  Miss Universe Breached First, Excusing Univision's Non-Performance........24

      3.  Trump Has Not Pleaded a Breach of the Implied Covenant...........................25

V.    CONCLUSION...............................................................................................................25

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Ace Arts, LLC v. Sony/ATV Music Publ'g, LLC,*
    56 F. Supp. 3d 436, 450–51 (S.D.N.Y. 2014)...................................................18, 20

*Armstrong v. Simon & Schuster, Inc.,*
    649 N.E.2d 825 (N.Y. 1995)..............................................................................10

*Aronson v. Wiersma,*
    483 N.E.2d 1138 (N.Y. 1985).......................................................................11, 12

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)...............................................................................8, 9, 17, 21

*Bais Yaakov of Spring Valley v. Alloy, Inc.,*
    936 F. Supp. 2d 272 (S.D.N.Y. 2013)....................................................................9

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007)...........................................................................8, 9, 20

*Biro v. Condé Nast,*
    883 F. Supp. 2d 441 (S.D.N.Y. 2012)..............................................................10, 13

*Cruz v. Marchetto,*
    No. 11 Civ. 8378, 2012 WL 4513484 (S.D.N.Y. Oct. 1, 2012) .............................14

*Davis v. City of New York,*
    641 N.Y.S.2d 275 (App. Div. 1st Dep't 1996) .......................................................15

*Dillon v. City of N.Y.,*
    704 N.Y.S.2d 1 (App. Div. 1st Dep't 1999) .........................................................13

*Garrison v. Toshiba Bus. Sols. (USA), Inc.,*
    907 F. Supp. 2d 301 (E.D.N.Y. 2012) ...............................................................15

*Geraci v. Probst,*
    938 N.E.2d 917 (N.Y. 2010)..............................................................................16

*Girden v. Sandals Int'l,*
    262 F.3d 195 (2d Cir. 2001)..............................................................................14

*Golub v. Enquirer/Star Grp.,*
    681 N.E.2d 1282 (N.Y. 1997)............................................................................16

*Gross v. N.Y. Times Co.,*
    623 N.E.2d 1163 (N.Y. 1993)........................................................................12, 13

# TABLE OF AUTHORITIES
### (continued)

Page(s)

*Gui Ying Shi v. McDonald's Corp.*,
   972 N.Y.S.2d 307 (App. Div. 2d Dep't 2013)........................................................14

*Harris v. Mills*,
   572 F.3d 66 (2d Cir. 2009)..............................................................................9

*Huggins v. Moore*,
   726 N.E.2d 456 (N.Y. 1999)..........................................................................14

*Hustler Magazine, Inc. v. Falwell*,
   485 U.S. 46 (1988)......................................................................................13

*Int'l Audiotext Network v. Am. Tel. & Tel. Co.*,
   62 F.3d 69 (2d Cir. 1995)...............................................................................9

*James v. Gannett Co.*,
   353 N.E.2d 834 (N.Y. 1976).....................................................................10, 12

*Kerik v. Tacopina*,
   64 F. Supp. 3d 542, 569 (S.D.N.Y. 2014).........................................................16

*Kirke La Shelle Co. v. Paul Armstrong Co.*,
   188 N.E. 163 (1933)....................................................................................24

*Lakeville Pace Mech., Inc. v. Elmar Realty Corp.*,
   714 N.Y.S.2d 338 (App. Div. 2nd Dep't 2000)....................................................25

*Lama Holding Co. v. Smith Barney Inc.*,
   668 N.E.2d 1370 (N.Y. 1996).........................................................................20

*Leadsinger, Inc. v. Cole*,
   No. 05 Civ. 5606, 2006 WL 2320544 (S.D.N.Y. Aug. 10, 2006) ...........................18

*LeBlanc v. Skinner*,
   955 N.Y.S.2d 391 (App. Div. 2d Dep't 2012).....................................................13

*Lenel Sys. Int'l, Inc. v. Smith*,
   824 N.Y.S.2d 553 (App. Div. 4th Dep't 2006).....................................................24

*Loughry v. Lincoln First Bank*,
   494 N.E.2d 70 (N.Y. 1986)............................................................................16

*M.J. & K. Co. v. Matthew Bender & Co.*,
   631 N.Y.S.2d 938 (App. Div. 2d Dep't 1995).....................................................19

# TABLE OF AUTHORITIES
### (continued)

Page(s)

*Mann v. Abel,*
   885 N.E.2d 884 (N.Y. 2008) ................................................................................12

*In re Merrill Lynch & Co. Research Reports Sec. Litig.,*
   289 F. Supp. 2d 416 (S.D.N.Y. 2003) ................................................................23

*N.Y. Times Co. v. Sullivan,*
   376 U.S. 254 (1964) ............................................................................................14

*NAACP v. Claiborne Hardware Co.,*
   458 U.S. 886 (1982) ............................................................................................21

*Orange County Choppers, Inc. v. Olaes Enters.,*
   497 F. Supp. 2d 541 (S.D.N.Y. 2007) ................................................................17

*PPF Safeguard, LLC v. BCR Safeguard Holding, LLC,*
   924 N.Y.S.2d 391 (App. Div. 1st Dep't 2011) ..................................................22

*Pani v. Empire Blue Cross Blue Shield,*
   152 F.3d 67 (2d Cir. 1998) ................................................................................22

*Prozeralik v. Capital Cities Commc'ns, Inc.,*
   626 N.E.2d 34 (N.Y. 1993) ................................................................................16

*Pursuit Inv. Management LLC v. Alpha Beta Capital Partners, L.P.,*
   8 N.Y.S.3d 283 (App. Div. 1st Dep't 2015) ......................................................18

*Russell v. Davies,*
   948 N.Y.S.2d 394 (App. Div. 2d Dep't 2012) ..................................................13

*Sage Realty Corp. v. Jugobanka, D.D.,*
   No. 95 Civ. 0323, 1998 WL 702272 (S.D.N.Y. Oct. 8, 1998) ..........................22

*Sandals Resorts Int'l Ltd. v. Google, Inc.,*
   925 N.Y.S.2d 407 (App. Div. 1st Dep't 2011) ..................................................11

*Silberman v. Georges,*
   456 N.Y.S.2d 395 (App. Div. 1st Dep't 1982) ............................................11, 13

*Silverman v. Daily News, L.P.,*
   11 N.Y.S.3d 674 (App. Div. 2d Dep't 2015) ....................................................13

*Simon v. Royal Business Funds Corp.,*
   310 N.Y.S.2d 409 (App. Div. 1st Dep't 1970) ..................................................21

## TABLE OF AUTHORITIES
(continued)

<u>Page(s)</u>

*Snyder v. Phelps,*
   562 U.S. 443 (2011)..............................................................................................21

*Steinhilber v. Alphonse,*
   501 N.E.2d 550 (N.Y. 1986)...................................................................10, 12, 13

*Syracuse Orthopedic Specialists, P.C. v. Hootnick,*
   839 N.Y.S.2d 897 (App. Div. 4th Dep't 2007).....................................................24

*Torain v. Liu,*
   279 F. App'x 46 (2d Cir. 2008) .......................................................................11, 13

*Trump v. Chicago Tribune Co.,*
   616 F. Supp. 1434 (S.D.N.Y. 1985)................................................................13, 14

*Washington Ave. Assocs., Inc. v. Euclid Equip., Inc.,*
   645 N.Y.S.2d 511 (App. Div. 2d Dep't 1996).....................................................19

*White Plains Coat & Apron Co. v. Cintas Corp.,*
   867 N.E.2d 381 (N.Y. 2007)...........................................................................17, 20

*Wolff v. Rare Medium, Inc.,*
   210 F. Supp. 2d 490 (S.D.N.Y. 2002), *aff'd on other grounds*, 65 F. App'x
   736 (2d Cir. 2003)................................................................................................20

## I.    PRELIMINARY STATEMENT

Donald Trump, a prominent national business figure and television celebrity, announced his candidacy for President of the United States on June 16, 2015.  Trump offended millions during that announcement when he made disgraceful allegations about Mexican immigrants, whom, he claims, "Mexico sends" across the border to America: "They're sending people that have lots of problems, and they're bringing those problems with us.  They're bringing drugs. They're bringing crime.  They're rapists.  And some, I assume, are good people."  Trump's inflammatory comments, which relied on shock value to grab headlines for his presidential bid, outraged Mexican Americans, Mexican immigrants, Hispanics, and other Americans of all backgrounds—prompting at least 20 companies (including NBC, ESPN, NASCAR, and Macy's) and the City of New York to take the extraordinary step of terminating business relationships with Trump and his brands in the weeks following his campaign announcement.

One of those companies, Univision, is the leading media company serving Hispanic America.  Its audience is predominantly Hispanic and largely Mexican-American.  Univision had recently acquired the Spanish-language broadcast rights to the Trump-branded Miss USA and Miss Universe pageants.  Through his diatribe, Trump destroyed the value of those broadcast rights, and neither Trump nor Miss Universe did anything to repair the damage in the aftermath of his speech.  The widespread outrage elicited by Trump's offensive comments was especially acute for Univision's sponsors and predominantly Hispanic viewers, who made clear that they would not patronize a business connected with Trump.

Of all the companies that fired him, Trump has focused on suing Univision, the most prominent company with a Hispanic identity, and one of its executives, a Mexican immigrant.  In search of yet more headlines, Trump has touted this suit and his *$500 million* claim for damages on the campaign trail—and barred Univision reporters from covering his events—while his representatives have held it up as a warning to anyone who would criticize Trump.

But the Amended Complaint fails to sufficiently plead critical elements of every claim asserted and should be dismissed.

1

To start, Trump's defamation claim is beyond frivolous.  It is premised entirely on the allegation that Alberto Ciurana, a Univision executive, used his social-media account to re-post an image of unknown provenance "showing" photographs of Trump and notorious Charleston, South Carolina church-shooter Dylann Roof side by side.  *See* Amended Compl. ("AC") ¶ 27 & AC Ex. A.  The actual depiction shows *only* two determinedly glum faces with similarly coiffed hair and the caption "No Comments."  To a reasonable viewer, the re-posted image conveys a tongue-in-cheek observation on Trump's appearance—hardly novel, given that Trump has long been lampooned for his hairstyle.  At most, the post could be construed as a criticism of Trump's extreme and controversial opinions on race and national origin.

In a Hail-Mary attempt to keep this count alive, Trump offers up the bizarre interpretation that the post either accused Trump of himself committing "similar heinous acts" of racially-motivated violence or of "incit[ing] others to commit similar heinous acts."  AC ¶ 28.  No one but Trump's lawyers could draw such a preposterous allegation from two undoctored photographs displayed side-by-side.  Trump's claim cannot even get out of the box—let alone go to a jury—when the defamatory meaning he alleges is inherently incredible as a matter of law.

Even if the visual comparison were interpreted to convey Ciurana's *opinion* on Trump's suitability for national office, that opinion would be entitled to absolute protection under New York law and the Federal Constitution.  There is a rich irony to Trump's cry that he is the target of an effort to "suppress [his] right to free speech," AC ¶ 26, when it is Trump himself—a candidate for President—who is attempting to invoke the coercive power of the courts to punish a citizen's speech.  That is not how our democracy works.  To the contrary, by announcing his noxious views on Mexican immigrants as part of his campaign platform, Trump invited vigorous debate and commentary—and he got it.  The fact that Trump is too "thin-skinned" to endure the kind of lampooning that has typified presidential campaigns since the founding of the Republic does not entitle him pursue a judgment and $500 million in alleged damages.  *See* Ex. D.[1]

---

[1]  Citations to "Ex." refer to the Mastro Declaration in support of this Motion to Dismiss.

Trump's tortious interference claim is similarly unsupported by relevant factual allegations, and it is implausible in the extreme. Although NBC is one of more than a dozen entities that severed ties with Trump soon after his offensive statements, the Amended Complaint asserts in conclusory terms that Univision caused the breakdown in Trump's business relationship with NBC in June 2015. AC ¶¶ 30–32.[2] Trump baldly alleges "[u]pon information and belief" that it was actually *Univision* pulling the strings at NBC—not NBC's own management. AC ¶ 30. To say that this claim is far-fetched would give it too much credit. As the Amended Complaint itself alleges, NBC owns Univision's biggest *competitor*, Telemundo— the company that stood to gain more than any other from Univision's termination of the Miss Universe agreement. AC ¶ 36. And as this Court observed, NBC "doesn't need Univision to tell it what to do." Ex. X at 15:7–8.

Unsurprisingly, nowhere does the Amended Complaint even attempt to allege facts that would explain how Univision executives commanded any influence over NBC's decision-making about whether to carry the pageants. Nor does Trump plead that Univision *procured* NBC's alleged breach using *improper means*, as New York law requires. There is an obvious, common-sense explanation for NBC's decision to drop Trump that has nothing to do with Univision: NBC independently decided, like many other companies, that Trump's anti-immigrant campaign rhetoric became too toxic for its business at that time.

Trump also demands damages for breach of contract based on Univision's termination of its own license agreement with Miss Universe and its supposed bad-faith effort to induce NBC to independently drop the pageants too. This latter allegation—that Univision breached the implied covenant of good faith and fair dealing by forcing out the English-language broadcaster on which the deal was conditioned—fails for the same reason as Trump's tortious interference claim: Trump has not plausibly pleaded that Univision dictated NBC's business decision.

---

[2] Trump has walked back from his original allegation that he was the target of an elaborate conspiracy by Hillary Clinton's political operatives embedded at Univision. *See* Compl. ¶ 2.

More fundamentally, the entire breach claim fails because Trump has pled himself out of court: the Amended Complaint and the public record show that Trump's anti-Mexican-immigrant tirades frustrated the essential purpose of Univision's agreement, which was to secure 100% of the advertising revenues from broadcasting the Trump-branded pageants in Spanish to Univision's predominantly Hispanic and largely Mexican-American audience.  AC ¶ 36. Trump's invective—and Miss Universe's silence in the face of it—rendered the pageants toxic to Univision's viewership, which obliterated the central goal of the licensing deal and the very reason Univision was carrying the programs.  Trump cannot now stick Univision with the bill.

## II.   FACTUAL BACKGROUND

### A.   Univision's Predominantly Hispanic and Mexican-American Audience.

Univision Networks & Studios, Inc. ("Univision") is the television programming subsidiary of Univision Communications Inc., America's largest Spanish-language media company.  AC ¶ 35.  Univision operates the Univision Network, the leading Spanish-language broadcaster in the United States, and its sister network UniMás; together, these networks reach more than 90% of Hispanic American households.  Ex. E; AC ¶¶ 34–35.  Univision is focused on producing and delivering content across multiple platforms to "inform, entertain, and empower Hispanic America."  Ex. F at 1.  The company prides itself on being the "#1 destination for entertainment, sports, and news among U.S. Hispanics."  *Id.*; AC ¶ 35.

### B.   Univision Bargains to Bring Miss USA and Other Pageants to Univision's Audience.

On January 14, 2015, Univision entered into a five-year license agreement (the "Agreement") with Miss Universe L.P., LLLP ("Miss Universe"), which gave Univision the exclusive right to air the Miss USA and Miss Universe pageants in Spanish in the United States through 2019.  AC ¶ 8; Ex. A (Agreement) § 3.  Under the Agreement, Univision was entitled to broadcast each annual competition on the Univision Network or UniMás and to keep "100% of all revenues generated from[] Univision's exploitation of the [pageants] in the Spanish language."  Ex. A §§ 3(a), 11.  Univision was also entitled to capitalize on its unique Spanish-speaking audience by "incorporat[ing] one (1) or more additional hosts [or] other talent" to

4

create a Spanish-language version of each Program for exhibition.  *Id.* § 4(a).  Miss Universe, in turn, agreed to "[c]ause each Final Event to be organized, staged and promoted in [a] manner such that it will be a first-class network-quality production" in line with "production standards for United States broadcast networks' prime-time programs."  AC ¶ 11; Ex. A § 2(a)(vi)-(b).

On January 28, 2015, Miss Universe President Paula Shugart announced the Agreement, touting this opportunity for "Univision, the number one media brand for U.S. Hispanics," and noting the parties' mutual goal of "bring[ing] unmatched entertainment to the . . . passionate, loyal audience that Univision offers," which is "one of the fastest growing and important demographic communities in the U.S."  AC ¶ 37; *see also* Ex. H at 2.  Trump himself pleads that Miss Universe's primary reason for contracting with Univision was to "capture [Spanish language] viewership" and "establish a lucrative market for related [Miss Universe] advertising" and "promotions" directed towards Univision's audience.  AC ¶ 36.

Trump, an owner and a prominent public face of Miss Universe (*see* AC ¶ 41; Exs. G–H), announced the deal by declaring that "[t]he Miss Universe and Miss USA pageants consistently rank as the most watched, most-coveted properties and entertainment programs around the world," and that "[a]dding Univision as one of our leading media partners . . . could not be more exciting."  Ex. H.  Univision was to air its first Miss USA pageant on July 12, 2015.  AC ¶ 25.

**C.    Trump Frustrates the Essential Purpose of the Agreement by Crassly Stereotyping and Denigrating Univision's Audience in his Presidential Campaign Announcement.**

On June 16, 2015, Trump announced his presidential candidacy in a speech covered by every major media outlet in the United States (and several outlets in Mexico).  AC ¶ 18; Exs. B, I–J.  Particularly noteworthy were Trump's comments on Mexican immigrants:

> When do we beat Mexico at the border?  They're laughing at us, at our stupidity.  And now they are beating us economically.  They are not our friend, believe me.  But they're killing us economically. The U.S. has become a dumping ground for everybody else's problems.  Thank you.  It's true, and these are the best and the finest.  **When Mexico sends its people, they're not sending their best.**  They're not sending you.  They're not sending you.  **They're sending people that have lots of problems, and they're bringing those problems with us.  They're bringing drugs.  They're**

5

> **bringing crime.  They're rapists.  And some, I assume, are
> good people.**  But I speak to border guards and they tell us what
> we're getting.  And it only makes common sense.  It only makes
> common sense.  They're sending us not the right people.

Ex. B at 2 (emphases added).  Rather than retract these inflammatory remarks, Trump spent the

following weeks publicly reiterating his view that Mexican people are "doing the raping."  Ex. K

at 3.  On June 30, 2015, Trump declared his June 16 statements on Mexican immigrants "totally

accurate" and suggested that most of the Mexican people at the border must be "rapists" because

many Central American immigrants are *victims* of rape.  Ex. L; *see also* AC ¶ 23.  On July 6,

Trump added that "tremendous infectious disease is pouring across the border."  Ex. M at 1.

Trump's careless stereotyping offended a broad swath of Univision's audience and was

demonstrably harmful to the company, which—in less than one month—was due to air the

Trump-branded Miss USA pageant to Univision's Hispanic American viewers for the very first

time.  *See* AC ¶ 25; Ex. G.  When it became apparent that Trump and Miss Universe would

neither remedy the damage to their brands nor distance themselves in any way from statements

that had created an extraordinary national backlash, sponsors and on-screen talent began to pull

out of the pageants.  On June 24, Colombian musician J Balvin cancelled his scheduled

performance during the Spanish-language broadcast, "citing his discomfort following comments

about Mexicans and Latins from Donald Trump."  Ex. O.  The next day, Cristián de la Fuente

and Roselyn Sánchez, two hosts of the Spanish-language production, quit in light of Trump's

"ignorant, racist and anti-Hispanic" comments.  Ex. Q at 2; Ex. N at 2.  Pageant judges Jonathan

Scott and Emmitt Smith, English-language hosts Thomas Roberts and Cheryl Burke, and

performers Natalie La Rose, Flo Rida, and Craig Wayne Boyd all followed soon after.  Ex. N at

2.  And on June 30, Mexico—four-time host and two-time winner of the Miss Universe

pageant—announced that it would not send a contestant to the next Miss Universe pageant in

January 2016.  Ex. P.  By the end of June, it was clear that Trump's anti-Mexican and anti-

immigrant views would be a focal point of his campaign and that the damage done to Univision's

programming deal was irrevocable.  *See* AC ¶ 19 (alleging that Univision informed Trump that

"in response to [his] June 16 comments . . . , Univision had been inundated with calls demanding that Univision immediately terminate its relationship with [Miss Universe] and Mr. Trump").

**D.      Univision Terminates the Spanish-Language Pageant Deal.**

On June 25, 2015, nine days after Trump made hostility towards Mexicans and immigrants a key part of his campaign platform, Univision announced that it would be ending its business relationship with Miss Universe based on Trump's "recent, insulting remarks about Mexican immigrants."  AC ¶ 25; Ex. Q.  On June 30, 2015, Univision sent a written notice of termination to Miss Universe and Trump.  Ex. R.

Many other companies also severed ties with Trump's now-toxic business properties. Since his initial remarks, at least 20 companies and the City of New York have publicly cancelled Trump-branded products, services, or events, or else have announced that they will no longer do business with Trump.  Ex. S at 3–11.  Those that fired Trump in the weeks following his campaign announcement included NBC—the parent of Trump's former partner in Miss Universe, NBC Pageants, Inc.—which announced on June 29, 2015 that it would no longer air the Miss Universe and Miss USA pageants on its network.  AC ¶¶ 31–32.[3]

**E.      Alberto Ciurana Re-Posts an Image of Trump to his Personal Instagram Account.**

Trump alleges that Alberto Ciurana is "Univision's President of Programming and Content."  AC ¶ 27.  On or about June 25, 2015, Ciurana, who is a Mexican immigrant, re-posted

---

[3]  Other entities that have severed ties with Trump since June 16, 2015 include: styling product supplier and Miss USA sponsor Farouk Systems; Mexico's largest television broadcaster, Televisa; television network Ora TV; Costa Rican broadcaster Teletica; Panamanian broadcaster Telemetro; craft brewer 5 Rabbit Cerveceria; Macy's; menswear designer Phillips-Van Heusen; the City of New York (for all official business); mattress maker Serta; Camping World/Good Sam; NASCAR; ESPN; The PGA of America, LPGA, and USGA; restauranteurs Jose Andrés and Geoffrey Zakarian; Perfumania; the FAA (which re-named three navigation points above Palm Beach International); and travel agent Apple Vacations.

an image of Trump to his Instagram social media account.[4]  The image, captioned "NO COMMENTS," juxtaposed photographs of Trump and Dylann Roof, "the 21 year old who was recently arrested in the murder of nine (9) African-Americans attending bible study at a church in Charleston, South Carolina" on June 17, 2015.  *Id.*; *see also* Ex. C.[5]  Ciurana later removed the image and posted in Spanish and English: "I'm [a] Mexican who was very upset by Mr. Trump's recent comments about Mexican immigrants, but I should not have re-posted the photo."  Ex. T.

**F.      Trump Sues on Behalf of Himself and Miss Universe.**

On June 30, 2015, Trump filed suit derivatively on behalf of Miss Universe in New York State Supreme Court, asserting claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and tortious interference with third-party contracts relating to the broadcasts.  Trump also personally sued Ciurana and Univision for defamation.  Trump sought an undifferentiated $500 million in damages, even though his 2015 filings with the Federal Election Commission disclosed that the entire Miss Universe business is worth no more than $50 million.  Ex. U at 23.  Defendants removed the case to this Court on July 10, 2015.  *See* D.I. 1.

On November 6, 2015, Trump filed the Amended Complaint.  D.I. 22.  Trump reiterates his claims for defamation, tortious interference, and breach of contract, but forgoes his previous demand for attorneys' fees based on defamation and tortious interference.

### III.      LEGAL STANDARD

A complaint must be dismissed pursuant to Rule 12(b)(6) unless it "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  The Court's first task on a motion to dismiss is to separate the complaint's legal conclusions—which do not receive a presumption of truth—from its factual allegations.  *Id.* at

---

[4]  Instagram is a free image-sharing website where users can post photographs and videos. Ciurana's personal account is located at www.instagram.com/albertociurana.

[5]  The image never appeared on Univision's official account, www.instagram.com/univision.

678–79; *see also Harris v. Mills*, 572 F.3d 66, 71–72 (2d Cir. 2009).

Once "[t]hreadbare recitals of the elements of [the] cause of action" and the "conclusory statements" purporting to support them are set aside, the remaining factual allegations must plausibly establish a violation of the law. *Harris*, 572 F.3d at 72. A claim is plausible only if the complaint "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. When there is an "obvious alternative explanation" for the complained-of outcome, the plaintiff has not plausibly alleged a violation of the law. *Twombly*, 550 U.S. at 567.

On a motion to dismiss, "[t]he complaint is deemed to include . . . any statements or documents incorporated by reference." *Int'l Audiotext Network v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995). This Court may also consider "documents or information contained in defendant's motion papers if plaintiff has knowledge or possession of the material and relied on it in framing the complaint," as well as "facts of which judicial notice may properly be taken under Rule 201 of the Federal Rules of Evidence." *Bais Yaakov of Spring Valley v. Alloy, Inc.*, 936 F. Supp. 2d 272, 277 (S.D.N.Y. 2013) (judicial notice of fact of publication of article).

## IV.   ARGUMENT

The Amended Complaint should be dismissed in its entirety. First, Trump's frivolous defamation claim against Ciurana and Univision (Count III) fails as a matter of law. Second, Trump has failed to plead any facts to support his entirely speculative claim that Univision tortiously interfered with Miss Universe's contracts with NBC and other, unidentified third parties (Count II). The few "facts" that are alleged simply regurgitate the elements of the claim under New York law—which is insufficient under *Twombly* and its progeny. Third, Trump's breach-of-contract theory (Count I) fails on the face of the Amended Complaint, which shows that Trump's remarks brought about the frustration of an essential purpose of the licensing deal and caused Miss Universe to breach first, which excused Univision from all of its obligations under the Agreement. And Trump's claim based on the implied covenant of good faith and fair dealing (incorporated into Count I)—which, like Trump's tortious interference claim, is based on

9

the allegation that Univision caused the termination of NBC's agreement to air the pageants—fails because Trump does not plead any facts establishing causation.

**A.    Trump's Frivolous Defamation Claim Fails for Multiple Independent Reasons.**

Trump's defamation claim against Univision and Ciurana should be dismissed with prejudice. "The New York Court of Appeals has explained that there is 'particular value' in resolving defamation claims at the pleading stage, 'so as not to protract litigation through discovery and trial and thereby chill the exercise of constitutionally protected freedoms.'" *Biro v. Condé Nast*, 883 F. Supp. 2d 441, 457 (S.D.N.Y. 2012) (quoting *Armstrong v. Simon & Schuster, Inc.*, 649 N.E.2d 825, 828 (N.Y. 1995)). Longstanding precedent reveals numerous reasons why the post is not actionable. Most important, there is nothing in a side-by-side depiction of two photographs captioned "NO COMMENTS" that is *provably false*, as New York law requires. At most, the Instagram post is a visual satire expressing the author's opinion of a presidential candidate—speech that is quintessentially protected by the constitutions of the United States and New York State. *See, e.g.*, *Steinhilber v. Alphonse*, 501 N.E.2d 550, 555–56 (N.Y. 1986) (holding non-actionable "a tasteless effort to lampoon plaintiff . . . as a 'scab'").

It is not enough for Trump to contend that defamatory meaning is an "issue of fact" for the jury. Ex. X at 4:9–15. The unreasonable interpretation alleged in the Amended Complaint (that the post accuses Trump of committing or inciting murder) does not entitle him to a trial on the merits, because "it is for the court to decide whether the words are susceptible of the meaning ascribed to them" in the first instance. *James v. Gannett Co.*, 353 N.E.2d 834, 837 (N.Y. 1976). Only "[i]f the contested statements are reasonably susceptible of a defamatory connotation" does it become "'the jury's function to say whether that was the sense in which the words were likely to be understood by the ordinary and average reader.'" *Id.* The complaint fails that basic test.

Trump also fails to plead a plausible case for holding Univision liable—or for damages.

**1.    No Reasonable Person Could Interpret the Image as a Provably False Statement of Fact, as Opposed to a Protected Opinion.**

Trump points to no *statement of fact* made by Ciurana or Univision, much less a false,

defamatory one.  First, the re-posted image and its caption ("No Comments") do not reasonably convey a precise meaning and therefore cannot be considered a *statement*.  Second, even if the message were reasonably clear, interpreted perhaps as a comparison of Trump and Roof's resemblances or an accusation that Trump and Roof hold similarly hostile views, both inferences would be protected *opinions*.  "[A] libel action cannot be maintained unless it is premised on published assertions of fact, rather than on assertions of opinion."  *Sandals Resorts Int'l Ltd. v. Google, Inc.*, 925 N.Y.S.2d 407, 412 (App. Div. 1st Dep't 2011) (quotation marks omitted).

Confronted with the bedrock requirement that he identify an actionable statement of fact conveyed by the re-posted image, Trump goes all-in on a strained and legally insufficient contention.  His entire defamation claim now hangs on the new allegation that "a reasonable person could understand Mr. Ciurana to be stating" one of two things: (i) "that Mr. Trump had committed heinous acts similar to Roof," and/or (ii) "that Mr. Trump had incited others to commit similar heinous acts."  AC ¶¶ 28, 62; Ex. X at 4:9–15.  But it is hornbook law that Trump cannot resort to thoroughly implausible interpretations of the image.  At the pleadings stage, the challenged depiction "must be construed in the context of the entire statement or publication as a whole, tested against the understanding of the average reader, and if not reasonably susceptible of a defamatory meaning, [it is] not actionable and cannot be made so by a strained or artificial construction."  *Aronson v. Wiersma*, 483 N.E.2d 1138, 1139 (N.Y. 1985).

As a matter of law, Trump's hypothesized interpretations of the image are just the sort of "strained and artificial" readings that courts routinely reject on the pleadings.  *Aronson*, 483 N.E.2d at 1139; *see also, e.g.*, *Torain v. Liu*, 279 F. App'x 46, 46 (2d Cir. 2008).  No reasonable viewer of the post could infer the criminal accusations that Trump conjures up.  For one thing, Trump is a presidential candidate vetted on a daily basis by the national press; it strains credulity to suggest that the average person would believe a post on Instagram to be conveying some hitherto-unknown truth about Trump's criminal past as a perpetrator or inciter of mass violence. *See, e.g.*, *Silberman v. Georges*, 456 N.Y.S.2d 395, 396–97 (App. Div. 1st Dep't 1982) (holding that defamation case "should not have gone to the jury" because painting depicting plaintiffs as

muggers "could not be intended, viewed by any reasonable person, as an accusation by defendant that either plaintiff had actually participated in an assault or related crime such as attempted homicide, or had any intention of so doing"). For another, what are the supposed "similar heinous acts" to which the image allegedly connects him? Dylann Roof's crime—killing nine people in a Church during Bible study—is "one of the worst hate crimes to ever take place on U.S. soil." AC ¶ 27. If Trump were concerned about being incorrectly associated with "similar" acts, he would be able to name them and plead a plausible basis for the confusion that reasonable viewers of the post might experience. He has not. Under New York law, "statements cannot be slanderous *per se* if reference to extrinsic facts is necessary to give them a defamatory import." *Aronson*, 483 N.E.2d at 1140.

Trump hopes to survive this motion to dismiss by arguing that the meaning of the image "is an issue for the trier of fact." Ex. X at 4:12–15. But New York law does not allow a plaintiff to invent fantastical meanings for a publication, then proceed to trial with a lottery ticket in hand. "It is the duty of the court, in an action for libel, to understand the publication in the same manner that others would naturally do," a *question of law* that is to be resolved "from the expressions used as from the whole scope and apparent object of the writer." *James*, 353 N.E.2d at 838 (quotation marks omitted). A statement is not actionable at all unless the Court first finds that "'the specific language in issue has a precise meaning which is readily understood.'" *Mann v. Abel*, 885 N.E.2d 884, 885–86 (N.Y. 2008). Here, at most the "average person" would interpret the re-posted image as a tongue-in-cheek "attempt at humor" or "an expression of disapproval." *Steinhilber*, 501 N.E.2d at 552–56 (quotation marks omitted). Under longstanding precedent, such an "opinion" is absolutely immune from challenge. *Id.* at 556.

The New York Court of Appeals has interpreted the New York Constitution to "embrace[] a test for determining what constitutes a nonactionable statement of opinion that is more flexible and is decidedly more protective of 'the cherished constitutional guarantee of free speech'" embodied in the First Amendment. *Gross v. N.Y. Times Co.*, 623 N.E.2d 1163, 1167 (N.Y. 1993). In applying New York's strict standard, courts have rejected defamation claims

based on "[l]oose, figurative or hyperbolic statements . . . deprecating the plaintiff," *Dillon v. City of N.Y.*, 704 N.Y.S.2d 1, 5 (App. Div. 1st Dep't 1999); "a vigorous epithet," *LeBlanc v. Skinner*, 955 N.Y.S.2d 391, 400 (App. Div. 2d Dep't 2012); and "opinion relating to matters of public concern which does not contain a provably false factual connotation," *Gross*, 623 N.E.2d at 1167.  Putting aside the unreasonable interpretations that Trump advances, nothing about the purely visual comparison that Ciurana re-posted could be seen as conveying a "precise meaning." *Torain*, 279 F. App'x at 46.  The most natural implication of the post is that Trump and Roof have a similar visual appearance, or are comparable in some other unstated way, and that is not actionable. *Steinhilber*, 501 N.E.2d at 555–56 (protecting "a tasteless effort to lampoon plaintiff"); *Biro*, 883 F. Supp. 2d at 460 ("'imaginative expression'" not actionable).  Even apparently factual claims have been protected where a reader would recognize them as parody, satire, rhetorical hyperbole, or fantasy.  *E.g.*, *Silberman*, 456 N.Y.S.2d at 396–97.

If, by some stretch, an unalleged—and far from plausible—meaning were to be forced from the image, it would be something to the effect that Trump and Roof hold comparably racist views.  But that implication would also be a protected statement of opinion—especially where, as here, the subject of the image is a national political figure.   "[O]ne of the prerogatives of American citizenship is the right to criticize public men and measures.  Such criticism, inevitably, will not always be reasoned or moderate; public figures as well as public officials will be subject to vehement, caustic, and sometimes unpleasantly sharp attacks." *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 51 (1988) (quotation marks omitted); *see also Russell v. Davies*, 948 N.Y.S.2d 394, 395–96 (App. Div. 2d Dep't 2012) (articles interpreting Congressional candidate's essay as "racist and anti-Semitic" "constituted non-actionable opinion"); *Silverman v. Daily News, L.P.*, 11 N.Y.S.3d 674, 675–76 (App. Div. 2d Dep't 2015) (report that political candidate's essays were "racist writings" protected as opinion).

At root, Trump is invoking the coercive power of the state to silence opinions with which he disagrees.  He should know better, having unsuccessfully attempted a similar defamation claim in this Court before.  *See Trump v. Chicago Tribune Co.*, 616 F. Supp. 1434 (S.D.N.Y.

13

1985).  Unhappy with the way that one of his construction projects had been portrayed in the press, Trump complained in that case that the reporter's depiction of the project amounted to libel.  *Id.* at 1441.  Judge Weinfeld dismissed Trump's claim, observing that—"having sought publicity for his [building] proposal"—Trump could not allege defamation merely because he found "unpleasing" the "negative opinions" that proposal engendered.  *Id.* at 1440.  The critical portrayal Trump challenged was not an actionable "matter of fact" because, as the Court noted, "there is no disputing about tastes."  *Id.* at 1441–42.  Trump's claim here fares no better.

Finally, because Trump is the hornbook definition of a "public figure," his claim requires further proof that the statement was made with "actual malice," *i.e.*, "with either knowledge that it was false or reckless disregard for the truth."  *Huggins v. Moore*, 726 N.E.2d 456, 459 (N.Y. 1999) (citing *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964)).  Because Trump has not identified a provably false assertion, he cannot plausibly plead that Ciurana knowingly or recklessly disregarded the "truth" in re-publishing the image.

### 2.     Trump Cannot Claim that Univision is Liable for Ciurana's Re-Post.

Even if Trump had alleged an actionable statement by Ciurana (and he has not), he cannot state a defamation claim against Univision.  "An employer is responsible for an employee's intentional tort only when the employee was acting within the scope of his or her employment when he or she committed the tort."  *Girden v. Sandals Int'l*, 262 F.3d 195, 205 (2d Cir. 2001).  Conversely, an employer "cannot be held vicariously liable . . . if the employee was acting solely for personal motives unrelated to the furtherance of the employer's business."  *Gui Ying Shi v. McDonald's Corp.*, 972 N.Y.S.2d 307, 309 (App. Div. 2d Dep't 2013).

Trump pleads only that Ciurana re-posted the photo on "his official Univision Instagram account."  AC ¶ 27.  That is insufficient as a matter of law, because Trump does not plead that Ciurana re-posted the photo while acting within the scope of his employment.  *See Cruz v. Marchetto*, No. 11 Civ. 8378, 2012 WL 4513484, at *7 (S.D.N.Y. Oct. 1, 2012) (dismissing complaint against employer where the "alleged statements . . . [were] not alleged to fall within the job description" of the employee).  Trump has not alleged anything about Ciurana's duties as

14

"President of Programming and Content at Univision," AC ¶ 6, or what (if anything) Ciurana's Instagram posts have to do with those duties.  And it is not enough that Ciurana's page identifies him as a Univision employee.  Millions of people mention their jobs on social media, but that does not make them their employer's public mouthpiece.  Indeed, Trump's claim that that Ciurana's page is an "official Univision" account is flatly contradicted by publicly available facts: Univision maintains its own, separate Instagram account.  *Supra* n.5.

Even if Ciurana's account *were*, by some stretch, considered an "official" Univision account, there are no allegations to support the further necessary inference that Ciurana was acting within the scope of his own official duties when he re-posted the image in question.  "[A]n employee's actions are not within the scope of employment unless the purpose in performing such actions is to further the employer's interest, or to carry out duties . . . in furthering the employer's business."  *See Davis v. City of New York*, 641 N.Y.S.2d 275, 276 (App. Div. 1st Dep't 1996); *Garrison v. Toshiba Bus. Sols. (USA), Inc.*, 907 F. Supp. 2d 301, 309 (E.D.N.Y. 2012) (dismissing defamation claim against employer where "it was neither [the employee's] job nor his responsibility to discuss internal . . . personnel investigations with . . . customers").  Here, Trump alleges only that Ciurana's job involves Univision's programming and content, *see* AC ¶ 27; he does not allege that Ciurana's duties also include communicating with the public.

To the contrary, it is inherently implausible that Ciurana was acting to further Univision's interests when he posted an allegedly "outrageously false and reckless" picture of a Univision business partner.  AC ¶ 28.  That Ciurana's re-posting of the image was the product of personal motives—and cannot be attributed to Univision—is further confirmed by Ciurana's subsequent declaration: "I'm [a] Mexican who was very upset by Mr. Trump's recent comments about Mexican immigrants, but I should not have re-posted the photo."  *See* Ex. T.

### 3.      Trump Has Failed to Plead Any Claim for Damages or Defamation *Per Se*.

Trump is not entitled to proceed with his defamation claim without at least some plausible allegation that his reputation—already suffering under the weight of his own intolerant pronouncements—has been further harmed by Ciurana's single Instagram post.  Special damages

are required to recover in defamation, *see Kerik v. Tacopina*, 64 F. Supp. 3d 542, 569 (S.D.N.Y. 2014), but Trump makes no effort to plead them.  Instead, Trump attempts to rely on a theory of defamation *per se*.  AC ¶ 68.  He may not do so.  In New York, defamation *per se* applies only to a statement that charges the plaintiff with "a serious crime," *Geraci v. Probst*, 938 N.E.2d 917, 922 (N.Y. 2010), or poor professional "performance," *Golub v. Enquirer/Star Grp.*, 681 N.E.2d 1282, 1283 (N.Y. 1997), or that suggests the plaintiff's "talent or ability" is "incompatible with the proper conduct of [his] business," *id*.  It does not apply to "a general reflection upon the [plaintiff's] character or qualities," such as an expression of disapproval for his appearance or his views.  *Id.*  Setting aside the incredible allegation that the Instagram post accused Trump of being a racist murderer (or an inciter of racist murderers)—which should be rejected as a matter of law—no reasonable viewer of Ciurana's Instagram page could have taken away the message that Trump is unable to conduct any particular line of business, and Trump makes no effort to identify the business abilities the post allegedly impugns.  Even if the re-posted image had an *effect* on Trump's "business dealings," AC ¶ 66, the image would still not be actionable because it is plainly not a statement about Trump's business performance.

Nor has Trump alleged any facts that would support an award of punitive damages against Ciurana or Univision.  *See* AC ¶ 67.  The unadorned assertion that "Defendants acted with wanton dishonesty," *id.*, is nowhere near sufficient to allege that the Instagram post was the product of "hatred, ill will, spite, criminal mental state or . . . common-law malice," as is required under New York law.  *See Prozeralik v. Capital Cities Commc'ns, Inc.*, 626 N.E.2d 34, 42 (N.Y. 1993).  The punitive damages claim against Ciurana should therefore be dismissed. And punitive damages premised on an employee's actions are available "only when a superior officer in the course of employment orders, participates in, or ratifies [the] outrageous conduct" underlying the claim.  *Loughry v. Lincoln First Bank*, 494 N.E.2d 70, 74–75 (N.Y. 1986). Because no such facts are alleged, the punitive damages claim against Univision also fails.

**B.     Plaintiffs Have Failed to State a Claim for Tortious Interference with Contract.**

In Count II, Trump attempts to blame Univision for NBC's decision to cut ties with Miss

Universe.  AC ¶¶ 30–32.  He tosses in, for good measure, the unadorned assertion that Univision convinced "various third parties" to do the same.  AC ¶¶ 54–58.  This claim should be dismissed, with prejudice, because Trump has again failed to allege any *facts* supporting its elements—even after being given an opportunity to re-plead.  "In a contract interference case . . . the plaintiff must show the existence of its valid contract with a third party, defendant's knowledge of that contract, defendant's intentional and improper procuring of a breach, and damages."  *White Plains Coat & Apron Co. v. Cintas Corp.*, 867 N.E.2d 381, 383 (N.Y. 2007).  In his Amended Complaint, Trump does not sufficiently allege that NBC (or, indeed, any third party) actually breached any contract.  Nor does he explain how Univision could plausibly have caused such a breach or how it could have done so using improper means.

Under *Iqbal*, the Court should rely on "judicial experience and common sense" to arrive at the much more obvious and likely explanation for NBC's actions: it simply joined the long list of companies and individuals hurrying to cut ties with Trump in the immediate aftermath of his outrageous remarks.  *See* 556 U.S. at 679.  Trump does not plead a realistic alternative—let alone one that would constitute a tort.  Even if Univision had communicated with NBC about its contemplated or upcoming business decisions, merely suggesting that a third party consider boycotting a business is constitutionally protected activity.

### 1.      Plaintiffs Fail to Plead that NBC Actually Breached.

As a threshold matter, Trump fails to claim that NBC actually breached its agreement with Miss Universe.  Instead, the Amended Complaint alleges only that NBC was "contractually obligated to broadcast the Miss Universe pageant," but "terminated its relationship with Plaintiffs" after Univision interfered.  AC ¶ 31.  These allegations are "deficient as a matter of law because," among other reasons, "they leave open the possibility that [NBC] lawfully terminated the contract or that the contract was terminable at will."  *Orange County Choppers, Inc. v. Olaes Enters.*, 497 F. Supp. 2d 541, 562 (S.D.N.Y. 2007).  That is, even taking as true the allegation that NBC had a duty to "'broadcast the first run of the MISS UNIVERSE Pageant,'" AC ¶ 31, the complaint's threadbare recitals do not provide sufficient support for the legal

17

conclusion that such a duty was *breached*, because it does not exclude other reasons why NBC might legitimately have walked away.  *See Ace Arts, LLC v. Sony/ATV Music Publ'g, LLC*, 56 F. Supp. 3d 436, 450–51 (S.D.N.Y. 2014) (dismissing "conclusory allegation" that defendant "did in fact . . . induce a breach and disruption of the Distribution Contract").  As for the unnamed "third parties" also alleged to be in cahoots with Univision, Trump's total failure to identify any such parties or details of the contracts is fatal to his claim.  *Leadsinger, Inc. v. Cole*, No. 05 Civ. 5606, 2006 WL 2320544, at *12 (S.D.N.Y. Aug. 10, 2006) (dismissing tortious interference claim for failing "to allege the relevant terms of the contracts").

> **2.     Plaintiffs Fail to Plead that Univision Caused NBC to Breach.**

Trump also must plead that Univision was a "but for" cause of a breach.  *See Pursuit Inv. Management LLC v. Alpha Beta Capital Partners, L.P.*, 8 N.Y.S.3d 283, 284 (App. Div. 1st Dep't 2015) (dismissing tortious interference claim where plaintiff failed to plead "'but for' causation of their purported damages").  He cannot plausibly do so.

Trump's claim is based entirely on the timing of when NBC decided to terminate its pageant relationship with Trump.  *See* AC ¶ 32; Ex. X at 13:18–20 (arguing only that "the timing of NBC's decision to not go forward with the pageant is somewhat suspect").  But that timing is easily explained by Trump's own actions, which caused almost two dozen other business partners to sever ties with him in the weeks following the announcement of his candidacy.  And "suspect timing" does nothing to suggest the mechanism by which Univision could have taken control of an unrelated media company as large as NBC.  As this Court observed, "NBC . . . doesn't need Univision to tell it what to do."  Ex. X at 15:6–8.

Yet Trump continues grasping at straws.  The Amended Complaint hollowly alleges that, "[u]pon information and belief, shortly after terminating its relationship with Plaintiffs," Univision executives "colluded" with executives at NBC "and/or otherwise used and/or threatened economic coercion and other improper and illegal tactics and means," in order "to cause NBC to permanently sever its contractual and business relationship with Plaintiffs." AC ¶ 30.  Trump adds that "many" Univision employees, including its "President and CEO,

Randy Falco," previously "worked at NBC," *id.*, presumably implying that Falco and others have ongoing contact with NBC officials.  Trump does not plead the threshold facts and circumstances of such communications—he only insinuates them in a roundabout fashion.  Nor does he suggest any reason *why* NBC would have "capitulated to Univision's threatened economic coercion and/or other improper and illegal tactics and means."  AC ¶ 31.

For those reasons, Trump does not (and cannot) plead that Univision was a "but for" cause of NBC's decision to sever ties with Trump and Miss Universe.  Nothing in the Amended Complaint explains why NBC, a sophisticated media company, would not come to its own conclusions about the continued viability of its contractual obligations.  *See Washington Ave. Assocs., Inc. v. Euclid Equip., Inc.*, 645 N.Y.S.2d 511, 512 (App. Div. 2d Dep't 1996) (dismissing claim where "plaintiff merely asserted that the [defendant] had conversations with [the alleged breaching party] which caused [it] to breach the lease agreement"); *M.J. & K. Co. v. Matthew Bender & Co.*, 631 N.Y.S.2d 938, 940 (App. Div. 2d Dep't 1995) (dismissing claim where plaintiffs alleged only that "third parties cancelled contracts with [plaintiffs] because of the alleged defamatory remarks made by [defendants]" about them).[6]

Rather, Trump's theory rests on circumstantial allegations that do not withstand the faintest scrutiny.  Trump makes an enormous inferential leap by suggesting that Univision must have been the reason why NBC terminated its agreement with Miss Universe on June 29 because NBC's decision was "a dramatic turnaround" from its less definitive statement three days earlier on June 26.  *See* AC ¶ 32.  But the premise of that allegation is demonstrably false: there was no "turnaround."  NBC's first statement was an immediate step to distance the company from Trump.  On June 26, NBC stated that it "[did] not agree with [Trump's] positions, including his recent comments on immigration," and that "Trump's opinions do not represent those of NBC."

---

[6]  Trump himself has stated that he believes NBC was influenced by factors that have nothing to do with Univision: "It was only after I informed NBC that I wouldn't do the *Apprentice* that they became upset w/ me.  They couldn't care less about 'inclusion.'"  Ex. V.

AC ¶ 32.  On June 29, NBC announced its decision to formally sever ties with Trump "due to [the same] recent derogatory statements . . . regarding immigrants."  AC ¶ 31.  Both statements conveyed the same core message—that NBC did not then want to be associated with Trump.

Trump feigns surprise that his remarks would cause a stir at all, as they are purportedly no different than his prior comments on immigration.  *See* AC ¶¶ 21–24.  But the Amended Complaint itself proves the opposite.  Whereas in the past Trump "cautioned that it was difficult to generalize the experience of all immigrants who had entered the United States illegally," AC ¶ 22, in June 2015 Trump declared that "when Mexico sends its people, they're not sending their best," calling Mexican immigrants rapists and criminals (but "assum[ing]" that "some" may be "good people"), Ex. B at 2.  And of course, Trump's recent remarks came at a unique national event announcing his presidential candidacy, which occurred scant weeks before NBC was to air Trump's Miss USA pageant.  By failing to account for these public facts, Trump's Amended Complaint fails to an exclude the "obvious alternative explanation," *Twombly*, 550 U.S. at 567, for NBC's decision: in the immediate aftermath of Trump's inflammatory remarks, NBC *independently* decided—like more than a dozen other companies—to terminate its relationship with Trump.

### 3.    At Most, Plaintiffs Plead Persuasion, Not "Improper Procurement."

Even assuming Univision had high-level conversations with NBC, such an attempt at "persuasion alone, even if it [was] knowingly directed at interference with the contract," is not enough to state a claim for tortious interference.  *Cf. Wolff v. Rare Medium, Inc*., 210 F. Supp. 2d 490, 499 (S.D.N.Y. 2002), *aff'd on other grounds*, 65 F. App'x 736 (2d Cir. 2003).  New York law requires "unjustified procurement" of the breach, *Wolff*, 65 F. App'x at 739 (citing *Lama Holding Co. v. Smith Barney Inc.*, 668 N.E.2d 1370, 1375 (N.Y. 1996)), which must "exceed[] a minimum level of ethical behavior in the marketplace," *White Plains*, 867 N.E.2d at 384.  *See also Ace Arts*, 56 F. Supp. 3d at 451 (dismissing claim where plaintiff could not plead that defendant brought lawsuit with "no belief in [its] merit").  Hence, Trump tellingly deleted his original allegation that Univision was "lobbying" NBC executives, *see* Compl. ¶ 30, apparently

recognizing that such activity falls far short of unjustified procurement.

But Trump's amended allegations are equally lacking.  Because procurement of the breach is an element of tortious interference, Trump's single catch-phrase—that Univision executives "colluded with their former colleagues at NBC and/or otherwise used and/or threatened economic coercion"—is a legal conclusion not entitled to the presumption of truth. *Iqbal*, 556 U.S. at 678.  Trump fails to allege any facts that might actually support such "collusion" *or* "coercion."[7]  The Amended Complaint does not plead any facts suggesting that Univision offered inducements or otherwise exerted economic pressure over NBC (or even that Univision had the capacity to do so).  In fact, any such allegation would be absurd because, as Trump himself alleges, NBC owns Telemundo—Univision's biggest competitor.  *See* AC ¶ 36.

Ultimately, following this Court's admonishment that he re-plead, Trump recast his conclusory allegations to regurgitate buzz words from the established legal standard—but he still fails to make out any cognizable allegations of fact.  Parroting the elements of a claim does not make a complaint plausible, and Trump's claim here should be dismissed.

Trump's theory also runs afoul of the First Amendment.  The Constitution firmly protects the right to lobby—in public and in private—and to call for a boycott of repugnant businesses or individuals.  *See NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 915 (1982) (direct economic boycotts by non-competitors are "entitled to the protection of the First Amendment") (citation omitted); *Snyder v. Phelps*, 562 U.S. 443, 451–59 (2011) (reviewing First Amendment grounds that would preclude private tort suits premised on an exercise of political speech).  What Trump derides as "an obvious attempt to politicize the situation" and miscasts as "suppress[ion]" of his

---

[7]  Nor has Trump plausibly alleged any uncompensated damages flowing from NBC's refusal to air the pageants, AC ¶ 30, given his public admission that he has "settled all lawsuits against them," Ex. W.  *See Simon v. Royal Business Funds Corp.*, 310 N.Y.S.2d 409, 410–11 (App. Div. 1st Dep't 1970) (dismissing plaintiff's tortious interference claim seeking "the same items of damage recoverable against his [contract] principal").

"right to free speech" has long been protected as a constitutional prerogative.  *See* AC ¶ 26.
Absent any plausible allegation of illegality, Univision's conduct is beyond challenge.

**C.      Trump's Amended Complaint Belies Any Claim to Relief under the Agreement.**

The Amended Complaint also shows why Univision was excused from any contractual
duty to broadcast Trump's pageants to Univision's predominantly Hispanic and largely Mexican-
American audience.  Trump's actions caused the essential purpose of the Univision-Miss
Universe Agreement to be frustrated, and Miss Universe breached its obligations to Univision in
the aftermath, excusing Univision from any obligations owed thereunder.

**1.      Trump Frustrated the Contract's Purpose, Rendering It a Nullity.**

A defendant may "invoke frustration of purpose as a defense for nonperformance" if "the
frustrated purpose [is] so completely the basis of the contract that, as both parties understood,
without it, the transaction would have made little sense."  *PPF Safeguard, LLC v. BCR
Safeguard Holding, LLC*, 924 N.Y.S.2d 391, 394 (App. Div. 1st Dep't 2011).  The relevant
inquiry is "whether the party seeking to avoid liability could have anticipated the frustrating
event and guarded against it."  *Sage Realty Corp. v. Jugobanka, D.D.*, No. 95 Civ. 0323, 1998
WL 702272, at *4 n.4 (S.D.N.Y. Oct. 8, 1998).  Although an affirmative defense, frustration of
purpose may be considered on a motion to dismiss where "the complaint itself establishes the
facts necessary to sustain [the] defense."  *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67,
74–75 (2d Cir. 1998) (permitting reliance "on matters of public record" to evaluate defense).

Trump himself describes the purpose of the Agreement as "an attempt to not only capture
[Univision's] viewership but also establish a lucrative market for related [Miss Universe]
advertising, in-telecast promotions, joint selling possibilities, licensing and merchandising"
among Hispanic Americans, including Mexican Americans.  AC ¶ 36; *see also* AC ¶ 45.
Univision bargained for "100% of all revenues generated from[] Univision's exploitation of the
[pageants] in the Spanish language" and the right to present a special Spanish-language version
of the broadcast incorporating Hispanic talent.  Ex. A §§ 3(a), 4(a), 11.  In short, the deal was
directed solely towards capitalizing on positive exposure to the Hispanic market.

22

Trump frustrated this essential purpose of the Agreement on June 16, 2015, when—less than a month before Univision was due to broadcast a customized, Spanish-language version of a Trump-branded pageant for the very first time—Trump publicly declared a vast swath of Univision's audience to be criminals and rapists.  AC ¶ 18; Ex. B at 2.  As the Amended Complaint concedes, Trump's statements were so noxious, and so clearly targeted to Univision's core demographic, that Univision was immediately "inundated with calls demanding that Univision immediately terminate its relationship with [Miss Universe] and Mr. Trump." AC ¶ 19.  The pageants' owners, Trump and Miss Universe, undoubtedly knew of the many performers, hosts, sponsors, and participant nations that had rapidly pulled out of the pageants in response to Trump's remarks.  Despite this widespread fallout, neither Trump nor Miss Universe attempted any sort of damage control.  As a result, Univision could not air the pageant without irreparably harming its business reputation and goodwill.

Trump pleads nothing to dispute the plain reality that coverage of the national fallout from his comments was legion in the weeks following his campaign announcement.  *E.g.*, Exs. I– Q; *cf. In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 289 F. Supp. 2d 416, 425 & n.15 (S.D.N.Y. 2003) (taking judicial notice of "widely broadcast explanations" for defendants' behavior on motion to dismiss).  Nor could Univision have reasonably foreseen Trump's comments or the unprecedented public backlash against them.  Indeed, the sheer magnitude of this backlash belies any claim that Trump's acts were run-of-the-mill or vintage Trump, or that Univision could have performed its obligations under the Agreement notwithstanding the cloud that hung over Trump's business properties.  Trump shocked the nation's conscience by accusing almost every Mexican immigrant (and many Univision viewers) of being criminals and rapists— then promising to become President of the United States on the strength of that indictment.  His broadside attack on immigrants provoked an unprecedented national response precisely *because* it came "when he announced he's running for President."  Ex. X at 14:3–4.

### 2.   Miss Universe Breached First, Excusing Univision's Non-Performance.

In addition to frustrating the purpose of Univision's Spanish-language deal, Trump and other representatives of Miss Universe also breached both the express and implied terms of the Agreement.  These first material breaches excused Univision from further performance and rendered the contract void as a matter of law.  "'[R]escission of a contract is permitted for such a breach as substantially defeats its purpose.'"  *Lenel Sys. Int'l, Inc. v. Smith*, 824 N.Y.S.2d 553, 554 (App. Div. 4th Dep't 2006).  Where, as here, "the evidence concerning the materiality [of the plaintiff's prior breach] is clear and substantially uncontradicted[,] the question is a matter of law for the court to decide."  *Syracuse Orthopedic Specialists, P.C. v. Hootnick*, 839 N.Y.S.2d 897, 900 (App. Div. 4th Dep't 2007); *see also Kirke La Shelle Co. v. Paul Armstrong Co.*, 188 N.E. 163, 168 (1933) (directing verdict on contract claim because of "implied obligation on the part of the respondents not to render valueless the right conferred by the contract").

Trump's evisceration of Univision's audience, sponsors, and talent—and Miss Universe's subsequent failure to distance itself from Trump and to preserve the value of its pageants— violated Sections 2(a)(vi) and 2(b) of the Agreement.  These sections required Miss Universe to "[c]ause each Final Event to be organized, staged and promoted in [a] manner such that it will be a first-class network-quality production" and to produce each pageant event "in accordance with the first class quality production standards for United States broadcast networks' prime-time programs."  *See* AC ¶ 11.  After Trump's notorious, oft-repeated comments in mid-June branded his businesses with the mark of anti-Mexican xenophobia and caused Hispanic talent to avoid appearing on stage at the pageants, the Miss USA pageant scheduled for July 12 and subsequent pageants could no longer be taken seriously as "first-class network-quality" events by anyone.  Furthermore, by prompting Mexico—prominent four-time location host and two-time winner of the Miss Universe pageant—to withdraw from future competitions, Trump caused a breach of Miss Universe's obligation to produce pageants "featur[ing] contestants from around the world . . . consistent with the production values, performances and other elements of past Miss Universe" events.  *See* AC ¶ 12; Ex. A § 1(a).  Miss Universe also breached the implied duty of

good faith and fair dealing by failing to take *any* steps in the weeks following June 16 to remedy the damage done.  Even worse, this reckless mishandling of the Miss Universe brand occurred before Univision could reap *any* benefit from the Agreement whatsoever.

### 3.    Trump Has Not Pleaded a Breach of the Implied Covenant.

Trump's alternative breach theory fails to state a claim.  Trump alleges that Univision's strong-arming of NBC breached the implied covenant of good faith and fair dealing because Univision thereby sought to "prevent [Miss Universe] from being able to honor [the] 'condition precedent' . . . to secure and maintain an English language broadcaster."  AC ¶ 47.  For the same reasons that Trump's tortious interference theory fails, these allegations should be dismissed as inherently implausible.  After Trump's nationally-publicized remarks caused a massive upheaval of his own business prospects, it would be extremely far-fetched to conclude that it was actually *Univision's executives* who made the business decisions at NBC.  *Supra* pp. 18–20.  If Miss Universe found itself unable to satisfy the condition precedent of maintaining an English-language network broadcaster, it has no one to blame but Trump.

The timing of Univision's alleged breach also makes no sense based on the alleged sequence of events.  Trump alleges that Univision executives did not begin "collud[ing] with" NBC until "shortly *after* terminating [Univision's] relationship with Plaintiffs" "on June 25."  AC ¶¶ 30, 46 (emphasis added).  Trump further alleges that NBC "capitulated" to Univision's actions "on June 29, 2015," when it "terminate[d] its relationship with Plaintiffs" in a "dramatic turnaround" from its prior position.  AC ¶¶ 31–32.  But if Univision terminated the Agreement on June 25—as is alleged—it owed no contractual duty of good faith and fair dealing to Miss Universe *after* that date; *i.e.*, during the June 25–29 period when it was allegedly colluding with NBC.  *E.g.*, *Lakeville Pace Mech., Inc. v. Elmar Realty Corp.*, 714 N.Y.S.2d 338, 342 (App. Div. 2nd Dep't 2000) ("[T]here can be no covenant of good faith and fair dealing implied where there is no contract.").

### V.    CONCLUSION

Defendants respectfully request that the Court dismiss all counts with prejudice.

Dated:  December 4, 2015

GIBSON, DUNN & CRUTCHER LLP

By:  /s/  *Randy M. Mastro*
　　　Randy M. Mastro
　　　Amer S. Ahmed

　　　200 Park Avenue
　　　New York, New York 10166-0193
　　　Tel.: (212) 351-4000
　　　Fax:  (212) 351-4035

　　　Miguel A. Estrada
　　　1050 Connecticut Avenue, N.W.
　　　Washington, DC  20036
　　　Tel.:  (202) 955-8500
　　　Fax:  (202) 530-9616

　　　*Attorneys for Defendants Univision Networks*
　　　*& Studios, Inc. and Alberto Ciurana*

26